**No. 25-30528**

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

UNITED STATES OF AMERICA,
Plaintiff – Appellee

v.

BENJAMIN TEKIPPE
Defendant - Appellant

---

**Appeal from Judgment**
**of United States District Court**
**for the Eastern District of Louisiana**
**(Honorable Barry W. Ashe)**
**Case No.: 2:21-CR-122-1**

---

# OPENING BRIEF OF DEFENDANT/APPELLANT BENJAMIN TEKIPPE

---

William P. Gibbens
Schonekas, Evans, McGoey
& McEachin, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Phone: (504) 680-6050
Fax: (504) 680-6051
billy@semmlaw.com

Attorney for Benjamin Tekippe

**CERTIFICATE OF INTERESTED PERSONS**

**No. 25-30528**

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

UNITED STATES OF AMERICA,
Plaintiff – Appellee

v.

BENJAMIN TEKIPPE
Defendant - Appellant

---

Pursuant to Fifth Circuit Local Rule 28.2.1(b), undersigned counsel for Appellant certifies that the following persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

United States of America
United States Attorney David I. Courcelle, E.D. La.
Assistant United States Attorney Kevin G. Boitmann
Department of Justice Attorney Samantha Usher
Department of Justice Attorney Kelly Zack Walters
Department of Justice Attorney Justin Woodard
Department of Justice Attorney Patrick Stevens Barr
Department of Justice Attorney Megan Roberts
Department of Justice Attorney Jeremy Raymond Sanders

Benjamin Tekippe
- Ian Atkinson, Esq.
- William Gibbens, Esq.
- Shannon R. Bourgeois, Esq.
- Frank G. DeSalvo, Esq.
- David Michael DeVillers, Esq.
- Robert Craig Stern, Esq.

*/s/ William P. Gibbens*
William P. Gibbens
Attorney of record for Benjamin Tekippe

## STATEMENT REGARDING ORAL ARGUMENT

Dr. Benjamin Tekippe submits that oral argument would assist the Court in making a correct disposition of this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................ iv

TABLE OF CONTENTS......................................................................................v

TABLE OF AUTHORITIES ........................................................................... vii

JURISDICTIONAL STATEMENT .....................................................................1

STATEMENT OF ISSUES ..................................................................................2

STATEMENT OF THE CASE............................................................................3

SUMMARY OF THE ARGUMENT ...................................................................4

ARGUMENT .......................................................................................................6

I. Standard of review.........................................................................................7

II. At trial, the government offered limited, marginal evidence of health care fraud. ...............................................................................................................8

A. The government's "out of town" theory did not prove pervasive fraud. 8

B. The government's "services not provided" theory was limited to a single patient. ..................................................................................................10

III. The government failed to prove a pervasive fraudulent scheme..................12

A. The government alleged a very broad scheme that it did not prove. ....14

B. The government based most of its case on conclusional statements by witnesses without any supporting evidence. .........................................15

IV. At sentencing, Dr. Tekippe presented evidence that, aside from the government's cherry-picked charges, his treatments and billing practices were legitimate.............................................................................................20

V. The district court erroneously held that Dr. Tekippe was required to ebut pervasiveness at trial. ........................................................................ 23

CONCLUSION ........................................................................................ 26

CERTIFICATE OF SERVICE ........................................................................ 27

CERTIFICATE OF COMPLIANCE .................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*United States v. Barnes*
979 F.3d 283, 311 (5th Cir. 2020) ....................13

*United States v. Beydoun*
469 F.3d 102, 107 (5th Cir. 2006) ....................8

*United States v. Dubor*
821 F. App'x 327, 329 (5th Cir. 2020)....................24

*United States v. Ezukanma*
756 F. App'x 360, 372 (5th Cir. 2018)....................25

*United States v. Harris*
597 F.3d 242, 250–51 (5th Cir. 2010) ....................7

*United States v. Hebron*
684 F.3d 554, 560 (5th Cir. 2012) .................... 7, 13, 23

*United States v. Mazkouri*
945 F.3d 293, 304 (5th Cir. 2019) ....................13

*United States v. Mesquias*
29 F.4th 276, 283 (5th Cir. 2022) ....................13

*United States v. Nelson*
732 F.3d 504, 521 (5th Cir. 2013) ....................13

*United States v. Nelson*
No. 23-60086, 2024 WL 3738883, at *5 (5th Cir. Aug. 9, 2024) ....................24

*United States v. St. John*
625 F. App'x 661, 668 (5th Cir. 2015)....................23

## Statutes

18 U.S.C. § 371 ....................1

18 U.S.C. § 1343 ........................................................................................1

21 U.S.C. § 2461 ........................................................................................1

28 U.S.C. § 1291 ........................................................................................1

**<u>Other Authorities</u>**

U.S.S.G. § 2B1.1 cmt. 3(C) ........................................................................7

# JURISDICTIONAL STATEMENT

This appeal arises from a judgment of conviction and a restitution order in a health care fraud case under 18 U.S.C. §§ 371 and 1343. Based on the district court's final judgment (ROA.763-769), this Court has jurisdiction under 28 U.S.C. § 1291 and 21 U.S.C. § 2461. Dr. Tekippe timely appealed. ROA.770.

## STATEMENT OF ISSUES

1. Whether the district court erred in finding that the government proved a pervasive health care fraud scheme and imposing sentence based on an intended loss amount of $740,842.36.

## STATEMENT OF THE CASE

The government charged the defendant, chiropractor Benjamin Tekippe, with six counts of healthcare fraud against Blue Cross Blue Shield of Louisiana ("BCBSLA"), one count of making a false statement to federal agents, and one count of wire fraud related to obtaining unemployment benefits. ROA.270. After a seven-day trial, the jury convicted Dr. Tekippe on all the healthcare fraud counts and the wire fraud count and acquitted him of the false statement count.

At sentencing, the district court found that Dr. Tekippe engaged in a fraudulent scheme that resulted in a loss of $740,842.36, which constituted all the payments Dr. Tekippe received from BCBSLA during the time period in the indictment, and that Dr. Tekippe's unemployment benefits wire fraud resulted in a loss of $12,982.00. Based on a total intended loss amount of $753,794.36, the district court calculated a guideline range of 121-151 months. However, finding that the intended loss resulted in a guideline sentence that was disproportionate with the nature and circumstances of the offense, the district court departed downward from the sentencing guidelines, imposed a sentence of 84 months, and ordered $753,794.36 in restitution. Rec. Doc. 174, p. 3, filed under seal.

## SUMMARY OF THE ARGUMENT

The government failed to prove a pervasive health care fraud scheme. Instead, the government cherry-picked several dates when Dr. Tekippe billed for services when he was out of the office and attempted to turn limited billing errors into a $2.3 million fraud scheme that encompassed all Dr. Tekippe's billings to BCBSLA for a three-year period. Because the government failed to prove a pervasive or extensive fraud scheme, the district court erred in determining that Dr. Tekippe's intended loss amount was $740,842.36, which includes **all** the payments that Dr. Tekippe received from BCBSLA during the time period of the indictment. As a result, the district court based Dr. Tekippe's sentence on an erroneous guideline calculation.

Despite the broad allegations in the indictment, the government's evidence at trial was limited to four patients: C.C., N.H., L.C., and K.U. Counts 1, 2, 4, 5, and 6 involved billings for these four patients on dates when Dr. Tekippe was out of town; and Count 3 involved billing for patient L.C., who claimed he did not receive a spinal manipulation on that particular date. The total amount billed to BCBSLA in connection with these counts was $430. ROA.276. The government introduced no medical records except for these four patients' records.[1] And aside from C.C., N.H., L.C., and K.U., there was virtually no discussion of any other patients at trial.

[1] With the exception of limited SOAP notes for patient R.P. *See* ROA.1039.

Instead, the government made conclusional, unsupported allegations of fraud and elicited broad, misleading testimony about Dr. Tekippe's billing practices without explanation, context, or supporting evidence. For example, the government repeatedly criticized Dr. Tekippe for billing the "same CPT codes" for 93% of his patients, without providing any explanation for why that is problematic—much less for why that is fraudulent. Similarly, the government elicited testimony that virtually "all" Dr. Tekippe's records were "cut and paste" and "identical," without introducing any records into evidence aside from the files of the four patients named in the indictment. As is discussed below, the government's limited evidence at trial did not provide a basis for the district court to find pervasive fraud for purposes of sentencing.

In contrast to the government's limited evidence, at sentencing Dr. Tekippe provided declarations from 25 patients who stated that they did indeed receive the services for which Dr. Tekippe billed. *See* Rec. Doc. 164, Ex. A (filed under seal). These declarations proved that the counts of conviction were the exception, not the norm, for Dr. Tekippe's practice. At sentencing, the district court improperly rejected this evidence, stating that Dr. Tekippe had the burden of rebutting the government's pervasive fraud theory **at trial**, that Tekippe failed to carry that burden at trial, and that sentencing was not the time to "start over." ROA.2004.

# ARGUMENT

At sentencing, the district court determined that the intended loss amount was "not less than the amount that the defendant actually received from Blue Cross which is $740,842.36." ROA.1987. This amount included **all** Dr. Tekippe's billings to BCBSLA for the entire period referenced in the indictment, from February 2017 to July 2020. This determination was erroneous for at least four reasons.

First, although the government argued that Dr. Tekippe's entire practice was fraudulent, it limited its evidence at trial to a narrow theory that Dr. Tekippe billed BCBSLA on four days when he was out of town and to a single patient who did not recall receiving certain services.

Second, the government failed to prove fraud beyond the counts of conviction. The government did not prove a pervasive or extensive fraudulent scheme such that it was not reasonably practicable to separate legitimate from fraudulent conduct. Although the government alleged a very broad scheme, it narrowly focused its evidence on days when Dr. Tekippe was out of town and on a single patient who did not recall receiving certain services. Beyond that limited evidence, the government based its "pervasive fraud" theory on conclusional statements by witnesses without any supporting evidence—for example, the government repeatedly argued, without explanation, that Dr. Tekippe committed fraud because he billed the same six CPT codes for 93% of his patients. And although the government contended that Dr.

Tekippe routinely billed for services that were not provided, two of the four patients the government called at trial confirmed that they received the services for which Dr. Tekippe billed.

Third, Dr. Tekippe rebutted the government's pervasive fraud theory (which only involved evidence related to four patients) by providing declarations from 25 patients at sentencing who confirmed that they received the services for which Dr. Tekippe billed.

Finally, the district court erroneously found that Dr. Tekippe was required to rebut the government's theory of pervasive or extensive fraud at trial, as opposed to sentencing.

## I. Standard of review

A district court's sentencing calculation "of the amount of loss is a factual finding reviewed for clear error." *United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012). However, a challenge to the method used to calculate loss is reviewed *de novo*, because that is an application of the guidelines, which is a question of law. *See United States v. Harris*, 597 F.3d 242, 250–51 (5th Cir. 2010). "Nonetheless, the guidelines emphasize the deference that must be shown to the sentencing judge, who is in a unique position to assess the applicable loss, so this court need only determine whether the district court made 'a reasonable estimate of the loss.'" *Hebron*, 684 F.3d at 560 (quoting U.S.S.G. § 2B1.1 cmt. 3(C)). "A district court's

fact-finding as to the amount of restitution ... is reviewed for clear error." *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006).

## II. At trial, the government offered limited, marginal evidence of health care fraud.

The government's proof at trial consisted primarily of showing (1) that Dr. Tekippe billed Blue Cross for services on four days when he was not in the office and (2) that one particular patient, L.C., claimed that he did not receive spinal manipulations on certain days.

### A. The government's "out of town" theory did not prove pervasive fraud.

Counts 1 and 2 charged that Dr. Tekippe billed for services for patients C.C. and N.H. on July 8, 2019 when he was in Aruba. ROA.1449. Count 4 charged that Dr. Tekippe billed for services for patient C.C. on September 11, 2019 when he was incarcerated in Whatcom County, Washington. ROA.1452. And Counts 5 and 6 charged that that Dr. Tekippe billed for services for patient K.U. on October 5 and October 10, 2019 when he was incarcerated in Coconino County, Arizona. ROA.1468.

However, with respect to Count 4, the evidence established that Dr. Hong Lee was serving as a substitute chiropractor when Dr. Tekippe was incarcerated on September 11, 2019. Although Dr. Lee did not have notes for patient C.C. on September 11, 2019, Dr. Lee's personal notes indicated that he treated at least five other patients on that date. ROA.4246-47 (Dr. Lee's personal Google notes,

indicating that Dr. Lee treated patients A.N., A.C., A.T., C.K., and J.S. on September 11, 2019).

Similarly, with respect to Count 5, the evidence established that Dr. Lee was serving as a substitute chiropractor when Dr. Tekippe was incarcerated in Coconino County, Arizona on October 5, 2019. Although Dr. Lee did not have a note for patient K.U. on October 5, 2019, Dr. Lee entered treatment notes for at least two other patients on that date. ROA.9073 (note for patient P.T.); ROA.9075 (note for patient J.A.).

Count 6 charged that Dr. Tekippe billed for patient K.U. while he was incarcerated in Arizona on October 10, 2019. But the evidence established that Dr. Lee was serving as a substitute chiropractor on October 10, 2019, and Dr. Lee did in fact enter a note indicating that he treated K.U. on that date. *See* ROA.3921 (indicating that Dr. Lee treated patient K.U. on October 10, 2019).

In addition, the evidence established that Dr. Tekippe also employed a second substitute chiropractor, Dr. John Waguespack, on dates when Tekippe was out of the office. ROA.916.

Accordingly, the evidence established that Dr. Tekippe's regular practice was to employ a substitute chiropractor when he was not in the office; the government cannot contend that Dr. Tekippe engaged in a "pervasive" practice of fraudulently

billing for patients when he was not there based on a few cherry-picked abnormalities.

### B. The government's "services not provided" theory was limited to a single patient.

Only one count charged that Dr. Tekippe billed for services that he did not provide while he was in his office. Count 3 charged Dr. Tekippe for billing for services for patient L.C. on July 24, 2019. ROA.276. The government stipulated that Dr. Tekippe was present in his office that day. ROA.1866. L.C. testified that he began seeing Dr. Tekippe for lower back pain in early 2018. ROA.1255. L.C. further testified that he stopped receiving spinal manipulations from Dr. Tekippe after two months, but that he would still go to Dr. Tekippe's clinic for electronic stimulation, the traction bed, and massages. ROA.1259.

But unlike patient L.C., patients K.U. and N.H.—two of the four patients called by the government—confirmed that they did receive treatments from Dr. Tekippe and other practitioners in his office.

Patient K.U.'s complaint was not that she was billed for treatments she did not receive, but that she thought her treatments were being billed to her auto insurance policy rather than her health insurance policy.

K.U. testified that she began seeing Dr. Tekippe in 2018 for injuries she sustained in a car accident. ROA.1178. She confirmed that she received massages, chiropractic adjustments, electrical stimulation, and cupping at Dr. Tekippe's clinic.

ROA.1179-1180. K.U. testified that she was not aware that Dr. Tekippe submitted 302 claims to Blue Cross for services rendered to her, not because she believed the services were fraudulent, but because she thought the services were being billed to the auto insurance policy related to her accident, rather than Blue Cross:

> Q. And you stated that you also received coverage related to an auto accident. What portion of your services did you think were being billed to Blue Cross versus the auto accident, if any?
>
> A. Before the doctor found out about my accident, I went in on my own. In the beginning, I used my health insurance.
>
> Q. And then you said "at the beginning," at one point did that change?
>
> A. That changed when records was requested and he found out I was in a car accident.
>
> Q. So at one point in time, it was your understanding that your Blue Cross Blue Shield was no longer being billed for the services that were rendered to you? It was instead the auto insurance?
>
> A. Correct.
>
> Q. When did you discover that all of your services provided had been billed to Blue Cross Blue Shield of Louisiana?
>
> A. When, while at work, I had a visitor to come to my job, and it was an FBI agent. Came in, sat, talked with them, showed me some information, and that's how I found out about what's going on right now.
>
> Q. Was any of that concerning when you found out from the FBI agent?
>
> A. Yes.

ROA.1182.

Patient N.H.—who also worked for Dr. Tekippe as his assistant and later as his office manager—testified that she received chiropractic services from the clinic. ROA.1293. N.H. stated that that she would receive massages, chiropractic adjustments, electrical stimulation, and mechanical traction, but that she would not receive therapeutic exercises. ROA.1293-94.

Like K.U., N.H. did not complain that she did not receive services; she thought she should have been getting the services for free as an employee:

> with chiropractic care, it's not a law but it is something that is done across boards, mainly because it's like an appreciation, so chiropractors usually do not charge their staff for any services. And so, at that point I would get all of the services, and if I were to get a massage, I would have to pay out of my pocket, and I would have to clock out of the office time to do so.

ROA.1293.

In light of the testimony of patients K.U. and N.H., patient L.C.'s testimony that he received some but not all services billed to his insurance company does not establish a pervasive scheme of billing for services not provided.

## III. The government failed to prove a pervasive fraudulent scheme.

The government's evidence in connection with Counts 1 through 6 did not establish pervasive fraud. Accordingly, the district court erred in imposing a sentence based on a loss amount that constituted **all** Dr. Tekippe's proceeds from BCBSLA for the entire time period in the indictment.

In a health care fraud case, the government bears the burden of proving loss. *United States v. Nelson*, 732 F.3d 504, 521 (5th Cir. 2013). The government must prove loss by a preponderance of the evidence at sentencing. *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012).

However, when there is a showing that the health care fraud is so pervasive that it is impractical to separate legitimate claims from fraudulent ones, the burden then shifts to the defendant to show which claims/amounts were legitimate. *United States v. Mesquias*, 29 F.4th 276, 283 (5th Cir. 2022). Only when there is "the absence of such evidence from the defendant," then the "district court may reasonably treat the entire claim for benefits as intended loss." *United States v. Mazkouri*, 945 F.3d 293, 304 (5th Cir. 2019). A "pervasiveness determination" is a "background factual finding that informs the ultimate methodology employed by the court," at sentencing. *United States v. Barnes,* 979 F.3d 283, 311 (5th Cir. 2020). The court must first determine that "fraud is pervasive" before applying the *Hebron* burden-shifting framework. *Id.*

At trial and at sentencing, the government advocated for a loss amount of $2.3 million, contending that Dr. Tekippe submitted "over $2.3 million in claims to BCBSLA for chiropractic services that were medically unnecessary, not rendered, or not rendered as represented." ROA.275. The government's $2.3 million amount

includes 100% of Dr. Tekippe's billings to BCBSLA for the time period of the indictment.

Although the district court rejected the government's proposed loss amount, it determined that Dr. Tekippe caused a loss of $740,842.36, which includes 100% of Dr. Tekippe's collections from BCBSLA. This determination is not supported by the evidence; the government did not present competent evidence of a health care fraud scheme beyond Counts 1 through 6 of the second superseding indictment.

Beyond the limited evidence directly related to Counts 1 through 6, the government based its "pervasive fraud" theory on conclusional statements by witnesses without any support. For example, the government repeatedly argued, without explanation, that Dr. Tekippe committed fraud because he billed the same six CPT codes for 93% of his patients. And although the government contended that Dr. Tekippe routinely billed for services that were not provided, two of the four patients the government called at trial confirmed that they received the services for which Dr. Tekippe billed.

### A. The government alleged a very broad scheme that it did not prove.

In its opening statement, the government told the jury that this is:

> a simple case of you can't be in two places at once. While the defendant lounged on a beach in Aruba or sat incarcerated in a jail cell on the West Coast of the United States, he led insurance companies like Blue Cross Blue Shield of Louisiana to believe that he was right here in the Eastern District of Louisiana, in Metairie, Louisiana, personally performing

> chiropractic adjustments on his patients. So, the insurance company paid out and ultimately funded the defendant's lavish lifestyle.

ROA.810-811.

The government also told the jury that "this is a case about a chiropractor who billed for services he never performed." ROA.811. "In the off chance that the defendant was actually in the office at his clinic in Metairie, you're going to hear that he was still billing for services he never performed, services he knew were false, that he wasn't performing himself, and that no other chiropractor in his practice was performing on his behalf." ROA.812.

And the government argued that "from February of 2017 all the way until July of 2020, [Dr. Tekippe] billed over $2.3 million worth of those services that he mostly never performed."

However, the government did not even attempt to prove such a broad scheme. The government offered evidence that Dr. Tekippe billed for services on four specific days and only offered the testimony of four patients. As is explained below, the government improperly attempted to fill the holes in its case with insinuations and conclusional accusations.

### B. The government based most of its case on conclusional statements by witnesses without any supporting evidence.

Throughout the trial, the government elicited testimony that Dr. Tekippe's billing practices were "concerning" or constituted "red flags." But aside from

pointing out these "concerns," the government failed to put forth any evidence of fraud.

The government called BCBSLA fraud investigator Misty Jones, who testified that Dr. Tekippe's billings were "very outrageous compared to previous cases that I've worked with similar billings." ROA.1005-1006. Without identifying any specific patients, Ms. Jones testified that she had a "concern" about copying and pasting between patient files, ROA.1032, and that she "couldn't tell if it was the chiropractic assistant or if it was actually Tekippe, the one that was performing the service," ROA.1033. Ultimately, Ms. Jones testified that "based on the complaint that [she] received, from all of the billing that [she] reviewed and from [her] prepayment review," Blue Cross terminated its contract with Dr. Tekippe. ROA.1040.

Similarly, Latisha Mire, the director of financial investigations for BCBSLA, testified that "93 percent of all the claims that were billed to Blue Cross were for the same six CPT codes." ROA.951. She said this raised concerns to her "[b]ecause typically you don't see the same services being rendered to every patient that a provider is seeing." ROA.951-952. Ms. Mire stated that Blue Cross initiated an audit of Dr. Tekippe because she considered 93 percent of claims being billed to the same code to be a "red flag." ROA.962. Mire did not explain the results of that audit, but testified that "[w]e did see some things that definitely just didn't seem

correct, and we ultimately made a referral to the FBI." ROA.962. However, Ms. Mire did not testify about a single patient file.

The government repeated these vague allegations of fraud with its case agent, FBI Special Agent Krista Bradford, who admitted that the government did not interview "more than ten" patients in its investigation. ROA.1506. Agent Bradford testified that the FBI "found in the investigation that there were billings submitted to Blue Cross Blue Shield for service that were either not performed, not performed as represented, or medically unnecessary." ROA.1413-14.

In support of this conclusion, Agent Bradford testified that "about 93 to 94 percent of the claims were all the same codes." ROA.1417. However, she did not explain why this was fraudulent.

Agent Bradford also testified that she reviewed L.C.'s patient file and found that his treatment notes from July 24, 2019 were "very similar to other, if not exactly the same, as other SOAP notes on different dates." ROA.1419. In response to questioning by the government, Agent Bradford further stated that L.C.'s file was not "an isolated incident" and that other medical records were "found to be cut and pasted":

> Q. So was Logan Camus, based on your investigation, an isolated incident?
>
> A. No.
>
> Q. Were other medical records found to be cut and pasted?

A. Yes.

ROA.1421. But the government did not ask Agent Bradford how many other medical records were found to be cut and pasted, and as mentioned above, the government limited its evidence at trial to the four patients named in the indictment.

The government's unexplained and unsupported conclusions that Dr. Tekippe billed the same codes "93% of the time" and that his medical records were "cut and pasted" cannot be used to establish pervasive fraud.

The government employed a similar strategy with Dr. John Waguespack, who did "did substitute work when [Dr. Tekippe] would be out of town." ROA.916. The government asked:

> Q. Dr. Waguespack, were you aware that Metairie Chiropractic billed over 2 million in claims to Blue Cross Blue Shield during the years that you were providing relief services on a few days?
>
> A. I was not aware of this.
>
> Q. Were you aware that approximately 93 percent of the claims billed were for the same six codes, including codes that you neither performed nor supervised?
>
> A. I was not aware of it.
>
> Q. Were you aware that patients were billed for services even on days that you were there as the chiropractor?
>
> A. I was not aware of that.
>
> Q. What is your reaction upon hearing all of this?
>
> A. What is that?

Q. What is your reaction upon hearing all of this?

A. Not good.

Q. Do you care to elaborate?

A. No. I had no idea.

ROA.924-925. The government did not ask Dr. Waguespack to explain why this was "not good." Nor did the government question Dr. Waguespack about a single patient or a single billing entry.

The government used the same tactic with Cindy Chu, a nurse who worked at Dr. Tekippe's clinic from the spring of 2018 to the summer of 2020. ROA.1047. Ms. Chu testified that she left Dr. Tekippe's practice "[b]ecause a lot of things I did there went against my morals and my ethics." ROA.1048. Without referring to any specific patients, Ms. Chu testified that, at Dr. Tekippe's instruction, she would (1) periodically change the pain levels in patients' charts without asking the patients what their pain level was, ROA.1050, (2) always enter a note that the patient's treatment was effective without knowing whether or not the treatment was actually effective, ROA.1056, and (3) always enter a note that the patient's condition had slightly improved without knowing whether or not the patient's condition had actually improved. ROA.1057. Without naming any specific patients, Ms. Chu also testified that "sometimes" patients would get massages and "[j]ust leave." ROA.1058-1059.

Conclusional testimony that Dr. Tekippe's billing was "very outrageous," that is practices "raised concerns," or that his substitute chiropractor's reaction to Tekippe's billing statistics was "not good" did nothing to establish a pervasive fraud scheme.

## IV. At sentencing, Dr. Tekippe presented evidence that, aside from the government's cherry-picked charges, his treatments and billing practices were legitimate.

Contradicting the government's theory (which is unsound to begin with), Dr. Tekippe presented evidence at sentencing from 25 patients who attested that they received the treatments for which he billed. *See* Rec. Doc. 164, filed under seal. These patients signed declarations explaining the chiropractic manipulations and other treatments they received from Dr. Tekippe.

Patient D.B., for example, stated that "while I was Dr. Tekippe's patient, my wife and I would regularly check our explanation of benefits from BCBS and we never saw any discrepancy between what was there and the services I received." Rec. Doc. 164, Ex. A at p. 4. D.B. further stated that "I remember Dr. Tekippe being there for almost all of my appointments. Off the top of my head, the only time I remember him not being there was when there was another chiropractor, an Asian guy, covering for him. I didn't let this other doctor do the chiropractic manipulations that Dr. Tekippe would usually do on me because I only trusted Dr. Tekippe to crack my neck and not make things worse." *Id.*

Patient C.B. stated that his treatment "included traction therapy, electrical stimulation, chiropractic adjustments, exercises, and massage therapy" and that "I have never received a massage standing alone. In fact, I tried to go for just a massage and was refused." Rec. Doc. 164, Ex. A, p. 5.

Patient A.B. stated that at her appointments, "I would regularly receive mechanical traction, electrical stimulation, therapeutic exercises, massage therapy, and chiropractic manipulation. I have distinct memories of Dr. Tekippe himself being the one performing the adjustments and making me do exercises (even when I didn't want to do them)." Rec. Doc. 164, Ex. A, p. 7.

Patient K.D. stated that he "had chiropractic manipulation at every appointment and Dr. Tekippe himself was usually the one providing that treatment. The only appointment when I distinctly remember someone else providing that treatment was toward the latter part of my treatment, maybe at the end of 2019, when another chiropractor handled the chiropractic manipulation because Dr. Tekippe was on vacation." Rec. Doc. 164, Ex. A, p. 9.

Patient G.F. stated that she regularly received "mechanical traction, electrical stimulation, therapeutic exercises, chiropractic manipulation, and massage therapy" and that "Dr. Tekippe himself was the one who would do the chiropractic manipulation and adjustments and demonstrate the therapeutic exercises." Rec. Doc. 164, Ex. A, p. 10.

Patient M.G. stated that, "while other staff members would start me off on the mechanical traction and electrical stimulation, and finish my appointments with massage therapy, Dr. Tekippe himself saw me almost every visit and was the one doing the chiropractic manipulation and showing me therapeutic exercises. On the one occasion when I distinctly remember Dr. Tekippe not being in the office himself to see me, there was however another chiropractor who saw me and provided chiropractic manipulation." Rec. Doc. 164, Ex. A, p. 11.

Patient A.H. stated that "Dr. Tekippe was present for most of my appointments. I can only remember two occasions when he wasn't, but there was another chiropractor at the office who filled in for him on those days." Rec. Doc. 164, Ex. A, p. 12.

Patient K.H. stated that the "treatments I regularly received included mechanical traction where I'd lie down on a roller table, electrical stimulation with a TENS machine, therapeutic exercises with bands that Dr. Tekippe would demonstrate himself, massage therapy, and chiropractic manipulation." She further stated that she only remembered "Dr. Tekippe not being there for one of my appointments, and at that appointment there was another chiropractor filling in for him . . . ." Rec. Doc. 164, Ex. A, p. 13.

All 25 of these patients provided similar evidence: that Dr. Tekippe personally performed the chiropractic adjustments that he billed to BCBSLA and, if Dr. Tekippe was not there, another chiropractor filled in for him.

These 25 patients constitute $158,237.14 of the $740,842.36 that Dr. Tekippe received from BCBSLA during the time period of the indictment. Rec. Doc. 164, Ex. A., p. 1.

In the face of these 25 patients, the government's limited trial evidence related to four patients does not establish a pervasive fraud scheme. Indeed, the government admitted that it did not even interview "more than 10" patients in its entire investigation. ROA.1506. Simply put, the government did not prove that all Dr. Tekippe's services, especially those administered on days when Dr. Tekippe was in the office, were fraudulent or that the fraud was "so pervasive" that separating legitimate from fraudulent conduct "is not reasonably practicable." *United States v. St. John*, 625 F. App'x 661, 668 (5th Cir. 2015) (quoting *United States v. Hebron,* 684 F.3d 554, 563 (5th Cir.2012)).

## V. The district court erroneously held that Dr. Tekippe was required to rebut pervasiveness at trial.

At sentencing, the district court stated that Dr. Tekippe had the burden of showing that the government's alleged scheme was not pervasive at trial. The district court stated:

> The Government is correct about the burden is when the scheme is of such a nature that it's impossible to separate, you know, the wheat from the chaff, the good claims from the bad claims, then it does become the defense's burden, and you know, **that's a burden that was to be borne at trial**. And you know, my recollection, I sat through all of that trial, my recollection is that with very limited circumstances, very limited discrete acts, that a burden wasn't borne, and so it's difficult to sort out the legitimate from the illegitimate.

ROA.2004 (emphasis added). The district court continued:

> So, you know, I don't think we can start over. The defendant—I mean the jury heard all of the evidence at the trial of a scheme and a scheme that was of some significant amount. The Court understands that, of course, there were services that were performed by Dr. Tekippe that were legitimate services that were performed and received by grateful patients who received value and good care from Dr. Tekippe.

ROA.2004-05.

The amount of loss is a factual determination for the district court to make for purposes of applying the Sentencing Guidelines. Logically, a finding of pervasiveness, and then the defendant's opportunity to rebut that finding for purposes of a loss calcuation, should take place at sentencing, not at trial. *See United States v. Dubor,* 821 F. App'x 327, 329 (5th Cir. 2020) (acknowledging that a loss determination made at sentencing is a factual finding for the district court); *United States v. Nelson*, No. 23-60086, 2024 WL 3738883, at *5 (5th Cir. Aug. 9, 2024) ("At sentencing, the Government introduced evidence…[b]ased on that evidence, the district court concluded that [Defendant's] fraud was pervasive"); *United States v. Ezukanma*, 756 F. App'x 360, 372 (5th Cir. 2018) (stating that, at sentencing, the

district court found "by a preponderance of the evidence that the relevant conduct…established by the evidence, by the government's proof, by the PSR, by the evidence at trial, and having carefully listened to the defense arguments" amounted to fraud sufficiently pervasive that the government's failure to interview every witness and look at every piece of paper is excused).

In addition, before trial, the district court "granted in its entirety" the government's motion in limine to exclude

> Argument, testimony, or other evidence of specific acts of good conduct, **including Tekippe's legitimate billing or his provision of legitimate services**, as circumstantial proof that he did not commit the crimes alleged in the indictment, because, says the Government, such evidence is not relevant to the charges alleged in the indictment, constitutes improper character evidence under Rule 405(b) of the Federal Rules of Evidence, and is more prejudicial than probative under Rule 403 of the Federal Rules of Evidence.

ROA.551.

Accordingly, the district court erred to the extent that it made a determination of a pervasive fraud scheme without considering the patient declarations discussed above.

Because the government did not prove a pervasive fraud scheme, the government should have come forward with a loss amount at sentencing. Instead, the government simply insisted that the loss amount was the entirety of Dr. Tekippe's billing for the time period in the indictment. This Court should hold that the government did not establish a pervasive fraud scheme and remand the case for

a new sentencing hearing at which the government should be required to come forth with a loss amount based on the limited evidence it introduced at trial.

## CONCLUSION

For the foregoing reasons, appellant Benjamin Tekippe respectfully asks the Court to remand the case for a new sentencing.

Respectfully submitted this 15th day of January, 2026.

*/s/ William P. Gibbens*
William P. Gibbens
Schonekas, Evans, McGoey
& McEachin, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
(504) 680-6050
billy@semmlaw.com

Attorney for Benjamin Tekippe

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing was electronically filed with the Court and that Counsel of Record, who are deemed to have consented to electronic service in the above-referenced case, are being served on the 15th day of January 2026 with a copy of the foregoing document via the Court's CM/ECF system.

*/s/ William P. Gibbens*
William P. Gibbens
Attorney for Appellant Benjamin Tekippe
Dated: January 15, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 28(a)(10), 28(b), and 32(g)(1), I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 5,487 words, exclusive of the certificate of interested parties, table of contents, table of authorities, statement of interest, certificates of counsel, and other items exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in Microsoft Word in a proportionally spaced typeface using a plain, roman-style, 14-point font.

*/s/ William P. Gibbens*
William P. Gibbens
Attorney for Appellant Benjamin Tekippe
Dated: January 15, 2026